## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WILLIAM DeFORTE,                          )
                                          )
        Plaintiff,                )
                                          )
          v.                    )     2:16-cv-00067
                                          )
                                          )     Judge Mark R. Hornak
THE BOROUGH OF WORTHINGTON,                )
KEVIN FEENEY, Individually and as Mayor    )
of the Borough of Worthington; and         )
GERALD RODGERS, Individually and as a      )
police officer of the Borough of           )
Worthington, Jointly and Severally,        )
                                          )
        Defendant.                )

## OPINION

**Mark R. Hornak, United States District Judge**

In this civil action, Plaintiff William DeForte ("Plaintiff"), a former police officer for the Borough of Worthington, has sued the Borough, Mayor Kevin Feeney, and former fellow police officer Gerald Rodgers for alleged wrongdoing in connection with his prosecution for alleged criminal offenses. This Court has subject matter jurisdiction over the case pursuant to 28 U.S.C. §§ 1331 and 1367.

Presently pending for the Court's consideration are the Defendants' motions to dismiss the Complaint (ECF Nos. 11 and 12) and Plaintiff's motion for leave to amend the Complaint (ECF No. 21). For the reasons that follow, Defendants' motions will be granted in part and denied in part, and Plaintiff's motion to amend the Complaint will be denied.

# I.   FACTUAL AND PROCEDURAL BACKGROUND[1]

On July 23, 2009, Plaintiff was hired as a police officer for Worthington Borough, Pennsylvania (hereafter, the "Borough" or "Worthington Borough"). (Compl. ¶8, ECF No. 1.) He was promoted to the position of Assistant Chief of Police in 2009 and was made Chief of Police on March 9, 2010. (*Id.* ¶¶ 9-10.)

During the course of his tenure with the Borough, Plaintiff often "clashed" with fellow police officer Gerald Rodgers ("Rodgers"), Borough Mayor Kevin Feeney ("Feeney"), and Borough Councilman and Constable Barry Rosen ("Rosen"). (Compl. ¶¶16, 21.) One source of conflict concerned Plaintiff's opposition to Feeney's and Rosen's practice of instructing officers that they had to cover the costs of their salaries and police vehicles by writing tickets and collecting fines. (*Id.* ¶¶18-19.) Another source of conflict concerned Plaintiff's investigation into Feeney's suspected involvement in the theft of radios that had allegedly been stolen from the Borough's fire hall. (*Id.* ¶17.) A third source involved Plaintiff's assessment that Rosen had unlawfully used police powers while acting in his capacity as Borough Constable. (*Id.* ¶¶21-24.) A fourth source involved Rodgers' operation of a logging truck in connection with his private logging business on roads in another township that he was not bonded to use. (*Id.* ¶¶25-26.)

On September 20, 2011, Feeney signed documentation guaranteeing that any money or equipment donated by officers to the Borough's police department could be retained by the officers as their personal property. (Compl. ¶55.) In reliance on the terms of this document, Plaintiff and fellow officer Evan Townsend ("Townsend") brought furniture, pictures, a television, and various other items to the police department. (*Id.* ¶56.) They also personally funded the acquisition of five (5) Sig Sauer 556 rifles and a handgun. (*Id.*) Feeney later

---

[1] The following background facts are derived from Plaintiff's Complaint (ECF No. 1). For present purposes, the Court must accept all well-pled averments in the Complaint, and all reasonable inferences arising therefrom, as true. *See Fowler v. UPMC Shadyside,* 578 F.3d 203, 210-11 (3d Cir. 2009).

2

permitted Plaintiff to exchange one of the Sig Sauer 556 rifles for a rifle of Plaintiff's choosing through a firearms dealer (*id.* ¶84), and he signed an authorization form acknowledging that Plaintiff could put the new rifle in his own (Plaintiff's) name. (*Id.* ¶¶85, 86.)

During times relevant to this litigation, Plaintiff also used an AR-15 style rifle (hereafter, "Rifle A") for training purposes, which was built mostly from parts that Plaintiff personally owned. (Compl. ¶30.) Specifically, the upper assembly of Rifle A was purchased and owned by Plaintiff, while the lower assembly was owned by the Worthington Borough police department, having been purchased with police equipment grant funds. (*Id.* ¶¶30-33.) The lower assembly of Rifle A could not fire or otherwise function as an operational rifle without the upper assembly. (*Id.* ¶¶36-37.)

Plaintiff also owned a second rifle, an MSAR STG-556 (the "STG-556"), which he used in 2010 and 2011 in connection with his duties as Worthington Borough Police Chief. (Compl. ¶¶40, 43.) At some point prior to April 23, 2011, Rodgers expressed interest in purchasing the STG-556 from Plaintiff. (*Id.* ¶¶ 41, 45.) Plaintiff agreed to sell Rodgers the STG-556 for $1,200.00 with the understanding that the sale would take place after Plaintiff became qualified to use Rifle A in lieu of the STG-556. (*Id.* ¶¶ 42-43.) On or around April 23, 2011, Rodgers ordered an optic sight for the STG-556, which he intended to have installed on the rifle. (*Id.* ¶45.) Plaintiff subsequently took possession of the optic sight so that he could have it installed and properly aligned prior to transferring the STG-556 to Rodgers. (*Id.* ¶48.) In mid-May 2011, Plaintiff "zeroed in" the STG-556 with the optic sight. (*Id.* ¶49.) At that point, the rifle was in perfect functional condition. (*Id.* ¶50.)

In June of 2011, after qualifying to use Rifle A as his service rifle, Plaintiff transferred the STG-556 to Rodgers. (Compl. ¶¶ 51-52.) In exchange, Rodgers gave Plaintiff a check for $500 and promised to pay the remaining $700 balance. (*Id.* ¶¶53-54.)

Nearly one year later, in May of 2012, Officer Rodgers expressed to Plaintiff his interest in trading the STG-556 for Rifle A. (Compl. ¶¶57-58.) Plaintiff reminded Rodgers that he still owed a $700 balance for the STG-556. (*Id.* ¶59.) Plaintiff also advised Rodgers that Feeney would need to approve the transfer of Rife A's lower assembly, since that part of the rifle was owned by the Worthington Borough police department. (*Id*. ¶60.)

A few days later, Plaintiff spoke with Feeney about Rodger's request. Feeney remarked that Rodgers was a "top producer" in terms of issuing citations and tickets, and he ordered Plaintiff to transfer the lower assembly of Rifle A to Rodgers in order to keep Rodgers happy. (Compl. ¶¶61-65, 67.) Plaintiff subsequently informed Rodgers about his conversation with Feeney and told Rodgers that he did not want the STG-556, but another county official, "Constable Bracken," did. (*Id.* ¶¶68-69.)

On May 31, 2012, in the presence of Plaintiff and another Borough officer, Feeney signed paperwork approving the transfer of the lower assembly of Rifle A to Rodgers. (Compl. ¶¶70-72.) In reliance on this written authorization, Plaintiff agreed to transfer possession of the Rifle A to Rodgers. (*Id.* ¶76.) On or about that same day, Constable Bracken took possession of the STG-556. (*Id.* ¶73.) Upon transferring Rifle A to Rodgers, Plaintiff informed Rodgers that he would have to pay an extra $500 for the "Trijicon optic sight" that was installed on the weapon. (*Id.* ¶77.) Although Rodgers agreed to do so, he never made this additional payment, nor did he ever pay the $700 balance for the STG-556. (*Id.* ¶¶ 78, 54.)

At some point during the summer of 2012, Plaintiff discovered that Feeney had used thousands of dollars of police grant money to fund the repair and replacement of the traffic control light system on U.S. Route 422. (Compl. ¶¶89-92.) Plaintiff discussed the matter with Borough Secretary David Conoran, who remarked that many surreptitious practices happened in the Borough all the time. (*Id.* ¶92.) Following this conversation, Plaintiff opened an investigation into Feeney's suspected misuse of the police grant money. (*Id.* ¶93.)

Later that summer, the Borough's police department initiated an undercover prostitution sting operation, which resulted in several arrests. (Compl. ¶¶94-95.) The money confiscated from each arrest was placed into an individual evidence envelope, logged according to the arrest record, and placed in the police department's evidence locker. (*Id.* ¶96.) Once a case was disposed of in court, the corresponding cash envelop was no longer considered evidence; at that point it was transferred from the evidence locker to the gun safe until the money could be returned or recovered through forfeiture proceedings. (*Id.* ¶97.) Envelopes with cash corresponding to open criminal cases were stored in the evidence locker. (*Id.* ¶98.)

On October 24, 2012, matters came to a head when Plaintiff confronted Feeney regarding his suspected involvement in the theft of radios from the Borough's fire hall. (Compl. ¶99.) Feeney allegedly acknowledged taking the radios and inquired whether Plaintiff was investigating him. (*Id.* ¶100.) In the course of this conversation, Plaintiff referenced Feeney's practice of imposing citation quotas and also questioned Feeney about his use of police grant funds to purchase traffic control lights. (*Id.* ¶¶101-102.)

Two days later, on October 26, 2012, Plaintiff received word that the police department's computers and hard drives were missing. (Compl. ¶¶103-104.) Plaintiff went to the police department and confirmed the items were missing, along with all criminal investigation files

concerning Feeney and the firearms transfer records that Feeney had signed. (*Id.* ¶¶105-107.) All of the missing items were taken either from Plaintiff's private desk, without his permission, or from a locked cabinet. (*Id.* ¶108.)

That evening, Feeney confronted Plaintiff in the Borough Council's room, screaming and appearing as though he might physically attack Plaintiff. (Compl. ¶¶ 110, 112-113.) Feeney acknowledged that he had the missing firearm transfer documents and stated that he was going to turn Plaintiff in to the ATF, suggesting that, without documentation of Feeney's approval of the firearm transfers, Plaintiff would be facing legal trouble. (*Id.* ¶114.) Feeney then instructed Plaintiff to collect his belongings from the police department and leave. (*Id.* ¶115.) Plaintiff complied with this directive and removed all of his personal belongings from the department office. (*Id.* ¶116.)

At this point Evan Townsend, another Worthington Borough police officer, feared that Feeney would terminate him as well, because Townsend had initiated the investigation into Feeney's suspected theft of the radios. (Compl. ¶¶117-118.) Townsend therefore made the decision to return his department-issued rifle to the police department and gather his personal belongings. (*Id.* ¶¶118-119.) While at the police department, Townsend photographed the gun safe contents in order to document the fact that he had returned his rifle; he also photographed the large envelope containing the adjudicated files and money from the prostitution sting operation. (*Id.* ¶¶120-121.)

According to the official minutes of the Worthington Borough Council, Plaintiff was suspended from his duties as Chief of Police on October 26, 2012 for alleged "insubordination and other possible offenses." (Compl. ¶11.) He was officially terminated from his position on

November 5, 2012 during a meeting of the Borough Council that he was not permitted to attend. (*Id.* ¶¶12, 13.)

At times relevant to this lawsuit, Plaintiff -- while serving as Worthington Borough's Chief of Police -- was also simultaneously employed as a police commander with the Pine Township Police Department. (Compl. ¶125.) In that capacity, Plaintiff served under Pine Township Police Chief Christopher Airgood. (*Id.*) At some point, Plaintiff entrusted Airgood with the official documents that authorized the aforementioned firearms transfers. (*Id.* ¶128.) Airgood kept the Worthington Borough documents secured at the Pine Township police department. (*Id.* ¶128.)

On or about October 30, 2012, Feeney and Pine Township Supervisor Clyde Moore broke into the Pine Township Police Department office and cut the locks off of Airgood's and Plaintiff's personal lockers. (Compl. ¶¶123-125.) Several days later, Pine Township's supervisors summarily terminated Airgood's employment and disbanded the Township's police department. (*Id.* ¶126.) The following day, Airgood collected his and Plaintiff's personal belongings from the police department. (*Id.* ¶127.) Airgood noticed that certain personal items and effects were missing from the office, including the Worthington Borough documents that had been given to him by Plaintiff for safe keeping. (*Id.* ¶128.)

In August 2013, Plaintiff left Worthington Borough to attend law school at the University of Massachusetts at Dartmouth. (Compl. ¶135.) At the time, Plaintiff was still an active police officer holding the rank of captain at the North Buffalo Township police department. (*Id.* ¶¶ 133-134.) Plaintiff able to maintain his status as an active police office because North Buffalo Township gave him a flexible schedule which allowed him to work around his law school schedule. (*Id.* ¶¶133-134, 136.)

7

At one point in October 2013, Plaintiff was escorted to the Dean's office of his law school and advised that he could not carry his service weapons on campus because he was not a police officer and therefore was not covered by the Law Enforcement Safety Act. (Compl. ¶¶137-139.) Plaintiff produced his North Buffalo Township police credentials, which he claims were still valid, but the Dartmouth chief of police would not recognize them as legitimate. (*Id.* ¶¶140-141.) The police chief then remarked that Plaintiff should talk to Worthington Borough or the Pennsylvania State Police as to why this was happening to him. (*Id.* ¶142.) Plaintiff was subsequently charged in Massachusetts with criminal firearms possession; however, the charges were later dismissed after an investigation confirmed that Plaintiff was, in fact, permitted to carry his firearm under the Law Enforcement Safety Act. (*Id.* ¶¶143, 147.)

In or around January 2014, the Pennsylvania State Police filed various criminal charges against Plaintiff relating to firearm theft, radio theft, and the theft of money from the prostitution sting operation. (Compl. ¶144; *see also* ECF No. 11-2.) The following month, Plaintiff was informed by Conoran of a conversation that Conoran had overheard in November of 2012 during which Feeney, Rodgers, and Rosen had discussed ways to ensure that Plaintiff would never again hold employment as a police officer. (*Id.* ¶¶149-151.) Conoran allegedly informed Plaintiff that Feeney, Rodgers, and Rosen had alluded to using illegal means in order to ensure that Plaintiff would be arrested and prosecuted. (*Id.* ¶152.)

Plaintiff now claims that Feeney and Rodgers did, in fact, conspire with others to frame him for theft so that unjustified criminal charges would be brought against him. (Compl. ¶¶ 156, 166-167.) Specifically, Plaintiff avers that Rodgers and Feeney "intentionally and surreptitiously" took the money associated with adjudicated prostitution sting cases from the gun safe; Rosen then photographed the safe in order to document the purported theft of the money

envelopes. (*Id.* ¶¶174-175.)[2] Plaintiff also appears to be alleging that Rodgers and Feeney framed him for stealing Rifle A from the police department premises. The complaint suggests that Rodgers took possession of Rifle A, while Feeney falsely told the Pennsylvania State Police that he had never signed any documents authorizing the transfer of the weapon. (*Id.* ¶¶158, 168(i).) When confronted with the firearm transfer documents, Feeney allegedly admitted at first that he may have signed them but then later maintained, falsely, that his signature had been forged by Plaintiff. (*Id.* ¶¶159-160.)[3] Plaintiff also claims that Feeney planted evidence at the Pine Township Police Department – namely, two brand new handheld radios that were property of the Worthington Borough Police Department -- so that Plaintiff would be charged for the theft of the radios. (*Id.* ¶180.) Finally, Plaintiff appears to be asserting that he was falsely accused by Rodgers of theft in connection with the transfer of the STG-556.

On February 26, 2014, Plaintiff attended his preliminary hearing, after which the theft charges were bound over to the Court of Common Pleas. (*See* ECF No. 11-2.) According to Plaintiff, Rodgers was present at the preliminary hearing and provided false testimony in support of the bogus criminal charges. (Compl. ¶¶ 165(h)-(i), 166, 169, 171; *see also* ECF No. 11-2.)

Concerning his purchase of the STG-556, Rodgers testified: (a) that he paid a total of $1,500.00 (not $1,200.00) for the rifle, (b) that the first payment was a cash payment for $500.00 in early 2011, (c) that, shortly after this first cash payment, Rodgers discovered that the rifle was not functional, (d) that Rodgers then returned the STG-556 to Plaintiff, along with another $500.00 cash payment, so that Plaintiff could have the rifle repaired, and (e) that Rodgers made the final $500.00 payment in the form of a personal check. (*Id.* ¶¶ 165(a)-(f) and 168(a)-(e).)

---

[2] According to Plaintiff, these staged photographs were contradicted by Townsend's photographs of the evidence locker, taken earlier that same day, which documented the presence of the prostitution sting money. (Compl. ¶174.)

[3] Plaintiff claims that subsequent analysis by the PSP crime lab confirmed that the signatures were indeed Feeney's. (Compl. ¶162.)

Plaintiff claims that, in actuality, Rodgers received the fully functional STG-556 rifle in June 2011, at which time he made his first and only payment in the form of a personal check in the amount of $500.00, despite the agreed upon price of $1,200.00. (*Id.* ¶¶44, 50, 52-54, 168(a)-(d).) Moreover, Rodgers personally brought the STG-556 to the Worthington Borough police department on or about May 31, 2012, at which time he transferred it directly to Constable Bracken, "almost one year after he falsely told the court that he had returned it to [Plaintiff]." (*Id.* ¶168(e).)

Rodgers also testified concerning the supposed "theft" of Rifle A. According to Plaintiff, Rodgers told the court "that he did not know where the 'missing' rifle was from Worthington Borough, when in fact he knew that the 'missing' rifle was the one given to him by Mayor Feeney and was at that time in his exclusive possession in his personal gun safe at his residence." (Compl. ¶168(i).) Rodgers further testified , falsely, "that he did not know that the lower assembly to Rifle A was Worthington Borough property," thereby "alleging and insinuating that he was somehow mislead [sic] by [Plaintiff]." (*Id.* ¶170.)

With regard to the money obtained from the prostitution sting operation, Rodgers allegedly testified that: (a) he, Feeney, and Rosen went to the Worthington Borough Police Department on October 28, 2012 and secured the evidence locker with police tape and two locks, and (b) he (or others) took an inventory of the locker contents some thirty (30) days later, at which time money from the prostitution sting operation was found to be missing. (Compl. ¶¶168(j),172-173.) Plaintiff claims that the testimony was a lie "designed to illegaly create an appearance of theft of Worthington Borough property . . . ." (*Id.* ¶169.)

In the summer of 2014, Plaintiff received discovery materials from the district attorney's office. (Compl. ¶153.) From these materials, he allegedly learned for the first time that Feeney

and Rodgers had "participated and conspired to participate in planting evidence, stealing money from the [gun] safe and evidence locker," and "other activities" that resulted in him being criminally charged. (*Id.* ¶156.)

Later in 2014, Feeney testified at Plaintiff's omnibus motion hearing, at which time he acknowledged breaking into Plaintiff's locker at the Pine Township police department, with the help of a township supervisor. (Compl. ¶¶176-177.) Although Feeney claimed that he had only taken some gun magazines that he believed were property of the Worthington Borough Police Department, Plaintiff insists that, in actuality, Feeney took many more items from his locker – all of which were Plaintiff's personal property. (*Id.* ¶¶ 178-179.) Plaintiff theorizes that Feeney broke into his locker at the Pine Township Police Department in order to search for the remaining copies of the firearm transfer documents so that he could destroy them and thereby ensure that Plaintiff would be criminally charged. (*Id.* ¶181.)

In August 2015, the Armstrong County District Attorney's office agreed to a *nolle prosequi* all of the criminal charges against Plaintiff. (Compl. ¶163.) This lawsuit followed on January 14, 2016, with the filing of Plaintiff's four-count Complaint (ECF No. 1). Count I of the Complaint asserts federal claims against the Defendants pursuant to 42 U.S.C. §§ 1983, 1985, 1986 and 1988. Counts II through IV assert state law claims for malicious prosecution, abuse of process, and intentional infliction of emotional distress, respectively.

On March 28, 2016, separate motions to dismiss and supporting briefs were filed by Rodgers (ECF Nos. 11, 14) and the Borough/Feeney (ECF Nos. 12, 13). Plaintiff filed his responses and briefs opposing the motions on April 12, 2016 (ECF Nos. 15, 16, 17, 18). Defendants filed their respective replies one week later (ECF Nos. 19, 20).

On May 25, 2016, Plaintiff filed a motion to amend his Complaint so as to add two new causes of action (ECF No. 21). Proposed Count V would add claims against the Borough and Feeney for the alleged violation of Plaintiff's Fourth Amendment Rights, and conspiracy to violate Plaintiff's Fourth Amendment rights, relative to Feeney's allegedly unlawful search and seizure of personal property that Plaintiff had kept in a locker at the Pine Township police department. Proposed Count VI would add a claim against the Borough and Feeney for alleged conversion of that property.

The Borough and Feeney contest Plaintiff's proposed amendments on the grounds that the new claims are time-barred, unduly delayed and/or futile. (*See* ECF Nos. 24 and 25.)[4] Plaintiff has filed his reply (ECF No. 27) in support of the motion to amend, and the foregoing matters are now ripe for adjudication.

## II.   **DEFENDANTS' MOTION TO DISMISS**[5]

### *A.*   **Standard of Review**

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of cases that fail to state a claim upon which relief can be granted. Complaints must allege facts "sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). In assessing a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept

---

[4] Because the proposed additional claims are not directed at Rodgers, he did not raise any substantive response to Plaintiff's motion. (*See* Def. Rodgers' Br. Opp. Pl.'s Mot. Leave to Amend Compl. at 2, ECF No. 26.) To the extent a response would be deemed necessary by this Court, Rodgers simply adopted the positions and arguments asserted by Feeney in opposition to Plaintiff's motion to amend. (*Id.*)

[5] The Court will initially address Defendants' motions to dismiss the original Complaint rather than Plaintiff's motion to amend the Complaint. We do so for several reasons. First, the original Complaint presently remains the operative pleading. Second, the motion to amend merely proposes two additional causes of action; it does not purport to change any aspect of Counts I through IV and, therefore, the proposed amendments would not cure or moot out any deficiencies that may inhere in those counts. Third, as explained in more detail herein, Plaintiff's proposed amendment is not an amendment "as a matter of course" pursuant to Rule 15(a)(1); therefore, the Court must separately analyze whether the proposed amendments would pass muster under an ordinary Rule 12(b)(6) review.

all "well-pleaded facts as true"; any legal conclusions set forth in the complaint must be disregarded. *Fowler*, 578 F.3d at 210–11 (citing *Iqbal*, 556 U.S. at 677); *Phillips v. Cty. of Allegheny,* 515 F.3d 224, 233 (3d Cir. 2008).

In reviewing a Rule 12(b)(6) motion, a district court generally may not consider matters outside of the complaint. "If, on a motion under Rule 12(b)(6) ..., matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). An exception exists with respect to: (i) exhibits that are attached to the complaint; (ii) matters of public record; and, (iii) any undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the document is integral to or explicitly relied upon in the complaint. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

In this case, Rodgers has appended to his motion a copy of the Magisterial District Judge's docket from Plaintiff's state court criminal proceedings (ECF No. 11-2). Because this information is a matter of public record, it is appropriate for consideration at the Rule 12(b)(6) stage.

### *B.* Analysis of Counts 1 through IV

#### 1. Plaintiff's Federal Claims

In Count I of the Complaint, Plaintiff asserts federal claims against the Borough, Feeney, and Rodgers, under 42 U.S.C. §§1983, 1985, 1986 and 1988. We will address these claims seriatim.

#### a. 42 U.S.C. §1983

Section 1983 provides a private right of redress as against:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws...

42 U.S.C. §1983. A plaintiff seeking relief under §1983 must demonstrate "that the defendants, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury." *Elmore v. Cleary*, 399 F.3d 279, 281 (3d Cir. 2005).

Here, Plaintiff alleges that the Defendants violated his rights under both the Fourth and Fourteenth Amendments. Plaintiff also contends that Feeney and Rodgers committed these violations while acting under color of state law.

Defendants dispute that any constitutional violation has been pled. They argue that Plaintiff's official capacity claims should be dismissed for redundancy and that punitive damages cannot be awarded in the context of this case. To the extent individual capacity claims are being asserted, Rodgers denies personal liability on the grounds that (a) he is protected by the immunity afforded to judicial witnesses, and (b) Plaintiff has not pled facts to show that he acted under color of state law. Insofar as Plaintiff asserts a claim against Worthington Borough, Feeney and the Borough argue that no plausible basis for municipal liability has been pled.

### i.    Individual v. Official Capacity Claims

As an initial point, the Court must determine whether Plaintiff's claims against Feeney and Rodgers are asserted solely in the Defendants' official capacities or whether Plaintiff has also asserted personal capacity claims. The Supreme Court explained the distinction between the two types of liability in *Kentucky v. Graham*, 473 U.S. 159 (1985):

> Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. *See, e.g., Scheuer v. Rhodes*, 416 U.S. 232, 237–238, 94 S. Ct. 1683, 1686–1687, 40 L. Ed. 2d 90 (1974).

14

Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55, 98 S. Ct. 2018, 2035, n. 55, 56 L. Ed. 2d 611 1978). As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. *Brandon [v. Holt*, 469 U.S. 464, 471–472 (1985)]. It is not a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.[ ]

On the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. *See, e.g., Monroe v. Pape*, 365 U.S. 167, 81 S. Ct. 473, 5 L. Ed. 2d 492 (1961). More is required in an official-capacity action, however, for a governmental entity is liable under § 1983 only when the entity itself is a "'moving force'" behind the deprivation, *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S. Ct. 445, 454, 70 L. Ed. 2d 509 (1981) (quoting *Monell, supra*, 436 U.S., at 694, 98 S. Ct., at 2037); thus, in an official-capacity suit the entity's "policy or custom" must have played a part in the violation of federal law. *Monell, supra; Oklahoma City v. Tuttle*, 471 U.S. 808, 817–818, 105 S. Ct. 2427, 2433, 85 L. Ed. 2d 791 (1985); *id.*, at 827–828, 105 S. Ct., at 2437, 2438 (BRENNAN, J., concurring in judgment).[ ] When it comes to defenses to liability, an official in a personal-capacity action may, depending on his position, be able to assert personal immunity defenses, such as objectively reasonable reliance on existing law. *See Imbler v. Pachtman*, 424 U.S. 409, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976) (absolute immunity); *Pierson v. Ray*, 386 U.S. 547, 87 S. Ct. 1213, 18 L.Ed.2d 288 (1967) (same); *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982) (qualified immunity); *Wood v. Strickland*, 420 U.S. 308, 95 S. Ct. 992, 43 L. Ed. 2d 214 (1975) (same). In an official-capacity action, these defenses are unavailable. *Owen v. City of Independence*, 445 U.S. 622, 100 S. Ct. 1398, 63 L.Ed.2d 673 (1980); *see also Brandon v. Holt*, 469 U.S. 464, 105 S. Ct. 873, 83 L.Ed.2d 878 (1985).[ ] The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment. While not exhaustive, this list illustrates the basic distinction between personal- and official-capacity actions.[ ]

*Id.* at 165-67 (footnotes omitted). Typically, "[t]he course of proceedings" will indicate "the nature of the liability sought to be imposed." *Id.* at 167 n. 14 (citation and internal quotation marks omitted).

15

In this case, Rodgers and Feeney maintain that no individual capacity claims have been asserted against them. Their assumption appears to be based on Plaintiff's allegations that Rodgers and Feeney took action against him in their "official capacities." (*See, e.g.,* Compl. ¶166 ("Defendants Mayor Feeney and Officer Rodgers, both acting in their official capacities, did alter evidence, steal money, plant evidence, and give false testimony about firearms transfers so that Chief DeForte would be charged criminally."); *id.* ¶187 ("Both Mayor Feeney and Officer Rodgers while acting in their official capacities as Worthington Borough Mayor and Worthington Borough Police Officer, . . . maliciously directly influenced the Pennsylvania State Police and Armstrong County District Attorney's Office into initiating criminal proceedings.").)

Having carefully examined the Complaint, the Court is not persuaded that only "official capacity" claims have been asserted against Feeney and Rodgers for purposes of §1983. *Kentucky v. Graham* makes clear that, in distinguishing between official capacity and personal capacity lawsuits, the relevant consideration is not the capacity in which the defendant allegedly *took action*, but rather, the capacity in which the plaintiff seeks to hold the defendant *liable*. *See* 473 U.S. at 166 ("Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law," while official capacity suits are merely "another way of pleading an action against [a public] entity . . ."). Plaintiff's assertion that the underlying misconduct involved action taken within the scope of the Defendants' official capacities as a public employees has relevance in terms of §1983's requirement that the defendant be shown to have acted "under color of state law"; rather than precluding personal §1983 liability, Plaintiff's assertion supports it. *See Hafer v. Melo*, 502 U.S. 21, 27-28 (1991) ("The requirement of action under color of state law means that Hafer may be liable for discharging respondents precisely because of her authority as auditor general. We cannot accept

the novel proposition that this same official authority insulates Hafer from suit."). Moreover, because a plaintiff may simultaneously seek a recovery both from the official's personal assets and from the employing entity's assets, the concepts of individual-capacity and official-capacity suits are not mutually exclusive. *See Ritchie v. Coldwater Cmty. Sch.,* No. 1:11-CV-530, 2012 WL 2862037, at *7 n. 4 (W.D. Mich. July 11, 2012) (noting that the "two capacities are not mutually exclusive depending upon whether the individual defendant's acts are within the scope of their authority").

In this case, a fair reading of the Complaint suggests that Plaintiff is asserting both individual and official capacity claims. For example, the caption of the Complaint expressly names Feeney as a defendant both "[i]ndividually and as Mayor of the Borough of Worthington." (Compl. at 1, ECF No. 1.) Rodgers is similarly named both "[i]ndividually and as a [p]olice [o]fficer of the Borough of Worthington." *(Id.)* The caption also indicates that the Borough, Feeney, and Rodgers are being sued "[j]ointly and [s]everally," *(see id.),* which would make no sense if individual capacity claims were not being asserted. *See Garvin v. Borough,* No. CIV.A. 14-615, 2015 WL 4756394, at *2 (W.D. Pa. Aug. 11, 2015) (interpreting plaintiff's claims as being asserted against defendants in both their individual and official capacities based on information in the case caption). The fact that Plaintiff is requesting punitive damages is another factor supporting the Court's interpretation, since punitive damages are not available against a municipality or public employees sued in their official capacities. *See Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 266-267 (1981) (punitive damages are not available under §1983 from a municipality); *Gregory v. Chehi,* 843 F.2d 111, 119–20 (3d Cir. 1988) ("Punitive damages cannot be recovered from defendants in their official capacities.").

For these reasons, the Court will proceed on the basis that the individual defendants are being sued *both* in their personal and official capacities.[6] That issue having been decided, the Court next concludes that the "true" official capacity claims are redundant inasmuch as Worthington Borough, the employing entity, has already been named as a defendant in this action. *See Kentucky v. Graham*, 473 U.S. at 167 (observing that "[t]here is no longer a need to bring official-capacity actions against local government officials, for under *Monell*, *supra*, local government units can be sued directly for damages and injunctive or declaratory relief") (citation omitted). Because they are redundant, Plaintiff's official capacity claims against Feeney and Rodgers will be dismissed with prejudice.

## ii. Judicial Witness Immunity

The Court will next address Rodgers' argument that he is protected from liability under the doctrine of judicial witness immunity. It is well established that witnesses are immune from §1983 liability where the claim is based on allegations of perjury, either at trial or during pretrial proceedings. *See Rehberg v. Paulk*, 566 U.S. 356, 367 (2012) ("[A] trial witness has absolute immunity [from suit under § 1983] with respect to any claim based on the witness' testimony."); *McArdle v. Tronetti,* 961 F.2d 1083, 1085 (3d Cir. 1992) ("[W]itness immunity applies to testimony given at pretrial hearings as well as to trial testimony . . . .") (footnote omitted), *abrogated on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163 (1993); *Benckini v. Upper Saucon Twp*., No. CIV.A. 07-3580, 2008 WL 2050825, at *11 (E.D. Pa. May 13, 2008) (plaintiff's claim, although deficient, was

---

[6] In his reply brief, Feeney argues, out of "an abundance of caution," that, if he is indeed being sued in his individual capacity, then he is entitled to qualified immunity. Feeney did not assert this defense in his opening brief and, therefore, Plaintiff has not had the opportunity to respond to this argument. Accordingly, the Court declines to dismiss any claim on the basis of qualified immunity at this juncture. Feeney's motion to dismiss on this basis will be denied without prejudice to be reasserted, if appropriate, at a later stage of these proceedings.

independently barred because of the absolute immunity afforded to witnesses, including police officers, charged under § 1983 for alleged perjurious testimony at pretrial proceedings).

Rodgers' assertion of witness immunity is therefore valid and precludes any §1983 liability that is premised upon the testimony he proffered at Plaintiff's preliminary hearing. To the extent Plaintiff's §1983 claims are based on such testimony, those claims are dismissed with prejudice.

On the other hand, the Complaint also alleges non-testimonial misconduct on the part of Rodgers. In particular, Plaintiff avers that Rodgers acted with Feeney to essentially stage a fictitious theft of firearms and money and then frame Plaintiff for the alleged thefts. This type of misconduct is beyond the scope of judicial witness immunity, so the Court must consider whether Plaintiff's allegations in this regard are otherwise adequate to support a §1983 claim.

### iii. **Fourth Amendment Claims**

Plaintiff's §1983 claim is premised, in part, on his theory that Defendants' violated the Fourth Amendment's proscription against unreasonable seizures when they brought about his prosecution for baseless theft-related charges. *See* U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."). In his brief opposing the pending Rule 12(b)(6) motions, Plaintiff suggests that he is also pursuing a Fourth Amendment claim premised on false arrest. Defendants contend that no plausible Fourth Amendment violation of any variety has been pled in the complaint.

"To state a claim for false arrest under the Fourth Amendment, a plaintiff must establish: (1) that there was an arrest; and (2) that the arrest was made without probable cause." *James v. City of Wilkes–Barre*, 700 F.3d 675, 680 (3d Cir. 2012). "[W]here the police lack probable

19

cause to make an arrest, the arrestee has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest." *O'Connor v. City of Phila.*, 233 F. App'x 161, 164 (3d Cir. 2007) (internal quotation marks and citation omitted). A false arrest claim "'covers damages only for the time of detention until the issuance of process or arraignment, and not more.'" *Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007) (quoting *Montgomery v. De Simone*, 159 F.3d 120, 126 (3d Cir. 1998)).

In order to prove a Fourth Amendment malicious prosecution claim, a plaintiff must show: "(1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007) (emphasis added). Each of these elements must be satisfied in order for a plaintiff to prevail on a §1983 malicious prosecution claim. *Kossler v. Crisanti*, 564 F.3d 181, 186 (3d Cir. 2009). "[U]nlike the related cause of action for false arrest or imprisonment, [malicious prosecution] permits damages for confinement imposed pursuant to legal process." *Heck v. Humphrey*, 512 U.S. 477, 484 (1994).

Defendants contend that no Fourth Amendment violation has been stated because the allegations in the Complaint fail to establish a deprivation of Plaintiff's liberty that would be consistent with the concept of a Fourth Amendment "seizure." A "seizure" occurs for Fourth Amendment purposes "when there is a governmental termination of freedom of movement through means intentionally applied." *Scott v. Harris*, 550 U.S. 372, 381 (2007) (internal quotation marks and citation omitted); *see also Brendlin v. California*, 551 U.S. 249, 254 (2007)

.

("A person is seized" whenever officials "restrain[ ] his freedom of movement" such that he is "not free to leave").

The U.S. Court of Appeals for the Third Circuit has held that, even where an individual is not subject to formal pretrial detention, the circumstances may nevertheless give rise to a "continuing seizure" for Fourth Amendment purposes. *See, e.g., Gallo v. City of Phila.*, 161 F.3d 217, 222–24 (3d Cir.1998); *see also Schneyder v. Smith*, 653 F.3d 313, 319 (3d Cir. 2011). In *Schneyder,* the court recognized that "[p]re-trial restrictions of liberty aimed at securing a suspect's court attendance are all 'seizures' ... [because] the difference between detention in jail, release on bond, and release subject to compliance with other conditions is in the degree of restriction on the individual's liberty, not in the kind of restriction." 653 F.3d at 320 (emphasis in the original).

In *Gallo v. City of* Philadelphia, the court ruled that the plaintiff, although never arrested or detained, had nevertheless been "seized" for purposes of a Fourth Amendment malicious prosecution claim where he had been released post-indictment on a $10,000 personal recognizance bond, was required to contact pretrial services on a weekly basis, was prohibited from traveling outside of Pennsylvania and New Jersey, and was compelled to attend all court hearings over an eight and one-half month period. 161 F.3d at 218, 222-24. The court reasoned that "the combination of restrictions imposed on Gallo, because they intentionally limited his liberty, constituted a seizure." *Id.* at 225. Although the scope of the "seizure" was relatively limited, the court considered this factor germane to the issue of damages rather than liability. *Id.* at 224-25.

More recently, in *Black v. Montgomery Cty.*, 835 F.3d 358 (3d Cir. 2016), *as amended* (Sept. 16, 2016), the court applied the "continuing seizure" concept in the context of a malicious

prosecution case wherein the plaintiff, a resident of California, was prosecuted for alleged arson and related crimes in Pennsylvania. The court found that a number of alleged facts supported the plaintiff's claim that she had been "seized." Specifically, the plaintiff, having been charged with arson, faced serious criminal charges. 835 F.3d at 367. Less than one month after being interrogated by police and accused of committing arson, she flew from her home in California to Pennsylvania for her arraignment because a warrant had been issued for her arrest. *Id.* At the police station, she spent more than an hour being fingerprinted and photographed. *Id.* Thereafter, she was required to post unsecured bail of $50,000 and was told this would be forfeited if she did not attend all court proceedings. *Id.* at 367-68. Significantly, the plaintiff was required to fly from California to Pennsylvania for twelve pre-trial conferences in one year, presumably at her own expense. *Id.* at 368. Because she did not live in the jurisdiction in which she was tried, Black faced serious charges and the possibility of incarceration if she did not travel. *Id.* "[Her] life was presumably disrupted by the compulsion that she travel out of state a dozen times." *Id.* Given these circumstances, the court was satisfied that Black had alleged "constitutionally significant restrictions on [her] freedom of movement for the purpose of obtaining h[er] presence at a judicial proceeding," and she was therefore "seized within the meaning of the Fourth Amendment." *Id.* (internal quotation marks and citation omitted) (alterations in the original). *See also Brantley v. Wysocki,* 662 F. App'x 138, 141 (3d Cir. 2016) ("To determine whether there was a deprivation of liberty [for purposes of a Fourth Amendment malicious prosecution claim], we may consider, *inter alia*, whether a plaintiff was incarcerated, was detained in the police station, posted bond, was required to contact pretrial services, was prohibited from travelling or was required to travel to attend court.").

In this case, there were no restraints on Plaintiff's liberty that are comparable to those involved in *Gallo* or *Black*. He claims that he was charged by the Pennsylvania State Police for various theft-related offenses. The Magisterial District Judge's docket sheet indicates that these were second-degree felony and first-degree misdemeanor charges, so it is fair to say that the alleged criminal offenses were serious. However, Plaintiff nowhere alleges that he was arrested or required to post bond, and the docket sheet shows that he was actually released on his own recognizance. Plaintiff does not allege that he was restricted in his travel or required to report to the court on a regular basis prior to the case being *nolle prossed*. Consequently, there is no basis to conclude that Plaintiff was subjected to the type of "onerous" pretrial restrictions that might constitute a Fourth Amendment "seizure." *See DiBella v. Borough of Beachwood*, 407 F.3d 599, 603 (3d Cir. 2005) (noting that "pretrial custody and some onerous types of pretrial, non-custodial restrictions constitute a Fourth Amendment seizure," and holding that plaintiffs were not "seized" for purposes of a Fourth Amendment malicious prosecution claim when they were only issued a summons, they appeared in court only at their municipal court trial for criminal trespass, they were never arrested, they never posted bail, they were free to travel, and they did not have to report to pretrial services.).

Plaintiff argues in his brief that, "when a certified or licenced [sic] professional, who works under the public trust, is arrested their credentials and/or licence [sic] are seized as a direct result of the charge." (Pl.'s Br. Opp. Mot. Dismiss at 7, ECF No. 16.) Thus, Plaintiff appears to be arguing that he endured a "seizure" of sorts of his employment. However, any adverse consequences that Plaintiff experienced with respect to his licensure or employment prospects were not state-imposed restrictions designed to secure his appearance in court. *See Black*, 835 F.3d at 367 (defining "seizure" in terms of "[p]retrial restrictions of liberty aimed at securing a

23

suspect's court attendance") (quoting *Schneyder*, 653 F.3d at 319). Moreover, Plaintiff does not cite any authority to suggest that courts within this circuit would view his circumstances as tantamount to a Fourth Amendment seizure. Because Plaintiff has not alleged an arrest or other facts that would be sufficient to satisfy the fifth element of his malicious prosecution claim, no Fourth Amendment violation has been pled. To the extent Plaintiff's §1983 claim is predicated upon alleged violations of the Fourth Amendment, the claim will be dismissed with prejudice.

### iv. Fourteenth Amendment Claims

Plaintiff has also alleged a violation of his Fourteenth Amendment rights. Although the Complaint does not specify which of the Fourteenth Amendment's various clauses he is invoking, it appears from context that he is alleging a deprivation of his due process rights. *See* U.S. CONST. amend XIV, §1 ("nor shall any State deprive any person of life, liberty, or property, without due process of law").

In *Black v. Montgomery Cty.*, *supra*, the Third Circuit Court of Appeals held that "an acquitted criminal defendant may have a stand-alone fabricated evidence claim against state actors under the due process clause of the Fourteenth Amendment if there is a reasonable likelihood that, absent that fabricated evidence, the defendant would not have been criminally charged." 835 F.3d at 371. The court cautioned that a §1983 plaintiff must overcome various "hurdles" in establishing a due process violation based on fabricated evidence. The court more recently summarized these "hurdles" as follows:

> A plaintiff must demonstrate a "meaningful connection" between the injury and the use of the fabricated evidence. [*Black*, 835 F.3d at 372 (quoting *Halsey v. Pfeiffer*, 750 F.3d 273, 294 n.19 (3d Cir. 2014)]. There is also a requirement that the evidence be "so significant that it could have affected the outcome of the criminal case." *Id.* (quoting *Halsey*, 750 F.3d at 295). And, the standard required to demonstrate that evidence is fabricated is a "notable bar." *Id.* As an example, "testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong." *Id.* (quoting *Halsey*, 750 F.3d at

24

295). Lastly, because we require "persuasive evidence supporting a conclusion that the proponents of the evidence are aware that evidence is incorrect or that the evidence is offered in bad faith," *id.* (quoting *Halsey*, 750 F.3d at 295), we would look for allegations describing such evidence in a pleading designed to survive a motion to dismiss. Given those hurdles, we re-emphasized in *Black* that "we expect that it will be an unusual case in which a police officer cannot obtain a summary judgment in a civil action charging him with having fabricated evidence used in an earlier criminal case." *Id.* (quoting *Halsey*, 750 F.3d at 295).[ ]

*Boseman v. Upper Providence Twp.*, No. 16-1338, -- F. App'x --, 2017 WL 758480, at *4 (3d Cir. Feb. 27, 2017) (footnote omitted).

In this case, Plaintiff has alleged that Feeney and Rodgers maliciously staged a bogus theft of cash and firearms in order to frame Plaintiff for the thefts and effectuate the filing of baseless criminal charges against him. Rodgers denies that a plausible Fourteenth Amendment claim has been stated. He insists that, once the allegations related to his false testimony are stripped away, only "broad conclusory allegations" about altering evidence, stealing money, and planting evidence remain. (Br. Supp. Mot. Dismiss at 7, ECF No. 14.) Rodgers further insists that Plaintiff's "conclusory" allegations "are contradicted by [Plaintiff's] allegations that it was Feeney who committed such acts." (*Id.* (citing Compl. ¶¶ 114, 117, 123-128, 158-162, 177-181).)

Rodgers' arguments do not provide grounds for dismissal of Plaintiff's Fourteenth Amendment claim at this stage of the proceedings. In the Complaint, Plaintiff asserts that Rodgers, together with Feeney, took cash from evidence envelopes previously held in the gun safe at the Worthington Borough Police Department, moved the envelopes to the evidence locker, and then staged a purported theft of the cash from those envelopes in order to frame Plaintiff for the alleged crime. (*See* Compl. ¶¶96-98, 120-122, 166, 168(j), 172-174.) The Complaint also attributes to Rodgers a number of specific, false statements concerning Plaintiff's actions relative to the STG-556 rifle and Rifle A, which allegedly gave rise to theft-related

25

charges. (*See* Compl. ¶¶165(a)-(g), 168(a)-(i), and 170-171.) Although Rodgers may not be held liable under §1983 for statements he made while testifying in the criminal proceedings, it can reasonably be inferred from the Complaint that Rodgers also gave false unsworn statements to the Pennsylvania State Police concerning these same matters in order to support the filing of criminal charges in the first instance. (*See* Compl. ¶157 (averring that, after receiving discovery materials, Plaintiff learned of statements that Rodgers had made against him); *id.* ¶165(h) ("It is averred that Officer Rodgers provided false information to the Pennsylvania State Police in order to have DeForte criminally charged."); *id.* ¶165(i)("It is averred that Officer Rodgers intentionally provided information so that Chief DeForte would have a criminal record and be permanently barred from being a police officer.").) If taken at face value, Plaintiff's allegations are sufficient to establish a "meaningful connection" between the allegedly fabricated evidence and the alleged constitutional injury because it is likely that, without the manufactured evidence, Plaintiff would not have been charged with criminal theft. Plaintiff's allegations are sufficiently factual to state a plausible due process violation based on Feeney's and Rodger's alleged involvement in fabricating evidence.

Rodgers insists, however, that Plaintiff's allegations about him stealing money and altering or fabricating evidence "are contradicted by [Plaintiff's] allegations that it was Feeney who committed such acts." (*Id.* (citing Compl. ¶¶ 114, 117, 123-128, 158-162, 177-181).) This argument lacks merit because the portions of the Complaint on which Rodgers relies concern other alleged wrongdoing, *to wit:* Feeney's admission that he possessed the firearm transfer documents (Compl. ¶ 114); Feeney's involvement in breaking into the Pine Township Police Department in order to secure and destroy any remaining copies of the firearm transfer documents (*id.* ¶¶123-128, 177-178, 181); Feeney's involvement in taking other items of

personal property from Plaintiff's Pine Township locker (*id.* ¶178-179); Feeney's untruthful statements to the Pennsylvania State Police about his signature on the firearm transfer documents (*id.* ¶¶158-162); Feeney's involvement in stealing the Borough's police radios (*id.* ¶¶ 117); and Feeney's involvement in planting those radios at the Pine Township Police Department (*id.* ¶180). Although Rodgers is not implicated in these particular acts of misconduct, the Complaint, as outlined above, specifically implicates Rodgers in staging a theft of firearms and cash from the Worthington Borough Police Department gun safe so that Plaintiff could be framed for the thefts.

At this stage of the proceedings, Plaintiff's allegations are sufficient to state a Fourteenth Amendment due process violation premised on the alleged fabrication of evidence. To the extent Defendants contend otherwise, their motions to dismiss on this basis are denied.

### v.    Color of State Law

In order to hold Rodgers and Feeney personally liable for a due process violation, Plaintiff must establish that they acted under color of state law. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150 (1970) ("The requirement that a defendant act under color of state law is essential in order to establish a claim under §1983."). "The traditional definition of acting under color of state law requires that the defendant in a §1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988) (internal quotation marks and citation omitted). "Although 'state employment is generally sufficient to render the defendant a state actor' not all torts committed by state employees constitute state action, even if committed while on duty." *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 24 (3d Cir.1997) (quoting *West,* 487 U.S. at 50). "For instance, a state employee who pursues purely private motives and whose

27

interaction with the victim is unconnected with his execution of official duties does not act under color of law." *Id.* "[T]he essence of section 1983's color of law requirement is that the alleged offender, in committing the act complained of, abused a power or position granted by the state." *Id.*

Here, Feeney does not challenge his status as a state actor, and the Court therefore need not consider whether Plaintiff's §1983 claims against him could be dismissed on that basis. Rodgers, on the other hand, *does* dispute his status as a state actor. In particular, Rodgers cites various decisions holding that police officers who testify at judicial proceedings do not act under color of state law. (*See* Def's Br. Supp. Mot. Dismiss at 8-9, ECF No. 14 (citing cases).) The Court has already determined that Rodgers cannot be liable under §1983 for conduct that involves testifying at a court proceeding, since he is protected by the absolute privilege afforded to judicial witnesses.

Nevertheless, not all of Rodgers' alleged misconduct involves acts of testifying as a witness. As previously noted, Plaintiff has alleged that Rodgers violated his rights when he helped stage a theft and gave false information to the state police that incriminated Plaintiff in the alleged theft. Certain of the allegedly "stolen" items belonged to and/or were taken from the Worthington Borough Police Department. To the extent Rodgers provided information against Plaintiff concerning the alleged theft of municipal property from within his department, Rodgers ostensibly acted in his capacity as a municipal employee, consistent with his responsibilities under state law. In addition, Plaintiff avers that Rodgers tampered with evidence in the course of purporting to conduct an "inventory." The inventorying of evidence surely falls within the scope of official police responsibilities. Thus, at least at this stage of the pleadings, it is plausible to conclude that Rodgers abused his power as a municipal employee and thereby acted under color

28

of state law when he purported to report official wrongdoing by a fellow Worthington Borough police officer.[7]

Rodgers nevertheless contends that, to the extent he is alleged to have acted against Plaintiff on the basis of personal animus, his action could not have been performed under color of state law. (*See* Def.'s Br. Supp. Mot. Dismiss at 10-11, ECF No. 14 (citing Compl. ¶¶ 16, 142, 151, 152, 156, 165(h)-(i), 166-67, 169, 197, 201-205).) Rodgers cites no authority in support of this proposition, and the Court is not persuaded that it is an accurate statement of the law. On the contrary, as we have noted, "a state employee who pursues purely private motives *and* whose interaction with the victim is unconnected with his execution of official duties does not act under color of law." *Bonenberger*, 132 F.3d at 24 (emphasis supplied). The phrasing of this test in the conjunctive means that both criteria are required in order to justify a finding that the defendant did not act under color of state law. Here, as discussed, Plaintiff has plausibly alleged a basis for establishing that Rodgers' alleged misconduct vis-a-vis Plaintiff was connected to his execution of official duties because it involved ostensible reports of theft from their common municipal employer after conducting an alleged inventory of evidence. Thus, the fact that Rodgers might have acted against Plaintiff on the basis of private animus does not preclude a finding that he acted under color of state law.

For present purposes, Plaintiff's due process claim against Rodgers for alleged fabrication of evidence will proceed. Rodgers' motion to dismiss will be denied in this respect.

---

[7] Even if Rodgers was not himself a state actor, there is no present dispute that Feeney acted under color of state law, and Plaintiff has plausibly alleged that Rodgers conspired with Feeney to violate his constitutional rights. The U.S. Supreme Court has long recognized that a person not employed by the state may nevertheless be considered a state actor if "he is a willful participant in joint activity with the State or its agents." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)(quotation marks omitted). Therefore the Complaint states an alternative basis for establishing that Rodgers acted "under color of state law."

### vi. Municipal Liability

Defendants Feeney and Worthington Borough contend that any §1983 claims against the Borough must be dismissed for failure to state a plausible basis for municipal liability. To the extent that Plaintiff's claims against the Borough survive, Defendants move to dismiss the request for punitive damages.

To establish a basis for compensatory damages or equitable relief against the Borough, the complaint must plead facts showing that a municipal policy, practice, or custom was the "moving force" behind the Plaintiff's alleged constitutional injury. *See Connick v. Thompson*, 563 U.S. 51, 60-61 (2011). A municipality is only liable when the alleged constitutional violation involves "a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." *Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 237 (3d Cir. 2013) (quoting *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996)). A policy is a, "... statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). A custom is "[practice] ... so permanent and well settled" that it is implemented, "with the force of law." *Id.* at 691. A complaint that includes no allegations regarding a municipal policy or custom must be dismissed. *See Breslin v. City & County of Phila.*, 92 F.R.D. 764, 765 (E.D. Pa. 1981).

Defendants contend that no claim for municipal liability under §1983 has been stated because the Complaint is devoid of allegations concerning a specific policy or custom implemented by the Borough. Plaintiff appears to concede this point, as he offers no argument to the contrary in his brief opposing dismissal. Because the Complaint states no plausible basis for

30

imposing municipal liability under §1983, the claims against the Borough will be dismissed with prejudice.

**b.    42 U.S.C. §1985**

Plaintiff also asserts claims under 42 U.S.C. §1985 in Count I of his Complaint. Section 1985 provides a means of redressing conspiracies to interfere with civil rights. It consists of three subparts, none of which applies to the facts alleged in this case.

Subsection (1) is facially inapplicable inasmuch as it "'prohibits two or more persons from interfering with a federal officer's performance of his duties.'" *Daniels v. Cynkin*, 597 F. App'x 704, 707 (3d Cir. 2015)(quoting *Desi's Pizza, Inc., v. City of Wilkes-Barre*, 321 F.3d 411, 423 n. 1 (3d Cir. 2003)); *Shulman v. Zsak*, 485 F. App'x 528, 531 (3d Cir. 2012) (same). Plaintiff contends that he has pled a §1985(1) conspiracy by alleging that Feeney and Rodgers conspired "to make sure Plaintiff would not be a policeman in North buffalo Township, or any other place." (Pl.'s Br. Opp. Mot. Dismiss at 9, ECF No. 16.) Plaintiff, however, is not, and does not claim to be, a federal officer; therefore, §1985(1) is inapplicable to this case.

Subsection (2) applies to conspiracies to obstruct the administration of justice through intimidation of parties, witnesses, or jurors. *See* 42 U.S.C. §1985(2); *Shulman,* 485 F. App'x at 531 (citing *Desi's Pizza, Inc.,* 321 F.3d at 423 n. 1). Plaintiff claims that he has pled a §1985(2) violation inasmuch he has alleged that the Defendants obstructed justice with the intent to deny him his right to equal protection of the laws. According to Plaintiff, "[t]his obstruction of justice occurred when Rodgers and Mayor Feeney intentionally altered evidence by way of stealing and moving evidence to make it appear as if [Plaintiff] had committed a crime." (Pl.'s Br. Opp. Mot. Dismiss at 9, ECF No. 18.) However, a viable §1985(2) claim also requires an invidious, class-based discriminatory intent on the part of conspirators. *See Daniels,* 597 F. App'x at 707.

31

Plaintiff does not allege any such class-based animus, so his §1985(2) claim fails to state a basis upon which relief can be granted.

Subsection (3) prohibits conspiracies to deprive persons of their rights or liberties under federal law. *See* 42 U.S.C. §1985(3). Like subsection (2), subsection (3) applies where the conspiracy is motivated by racial discrimination or some other class-based, invidiously discriminatory animus. *See Daniel*, 597 F. App'x at 707 (citations omitted); *Rivera v. Wesley*, No. CV 16-400-LPS, 2017 WL 936627, at *3 (D. Del. Mar. 9, 2017) ("It is a well-settled constitutional interpretation that 'intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'") (quoting *Kush v. Rutledge*, 460 U.S. 719, 726 (1983)). Because there are no allegations of invidiously discriminatory intent in this case, no § 1985(3) claim has been stated.

For these reasons, Plaintiff's claims under 42 U.S.C. §1985 will be dismissed with prejudice.

### c. 42 U.S.C. §1986

Count I of the Complaint also invokes 42 U.S.C. §1986, which provides a right of relief against "[e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do . . . ." Because §1985 is not implicated by the facts pled in this case, no claim can be stated against the Defendants under §1986. *See Heath v. Shannon*, 442 F. App'x 712, 718 (3d Cir. 2011) (per curiam) ("Because [the plaintiff] failed to state a conspiracy claim under §1985, the District Court properly ruled that his related §1986 claims also failed.") (citation omitted).

In addition, §1986 claims must be asserted within one year of accrual. *See* 42 U.S.C. §1986 ("[N]o action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued."); *Ormsby v. Luzerne Cty. Dep't of Pub. Welfare Office of Human Servs.*, 149 F. App'x 60, 62 (3d Cir. 2005)("[C]laims asserted under §1986 are subject to a one year statute of limitations."). Here, Plaintiff concedes that his §1986 claims are untimely. (*See* Pl.'s Br. Opp. Mot. Dismiss at 9, ECF No. 16.) Accordingly, those claims will be dismissed with prejudice.

### d.     42 U.S.C. §1988

Count I of the Complaint also invokes 42 U.S.C. § 1988. Section 1988 provides, in pertinent part, that "[i]n any action or proceeding to enforce a provision of sections ... 1983, 1985, and 1986 of this title, ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. 1988(b). This statute "creates no independent cause of action; it merely complements the various acts which do create federal causes of action for the violation of federal civil rights." *Hightower v. City of Phila.*, Civ.A No. 95-4490, 1995 WL 678661, at *5 (E.D. Pa. Nov. 13, 1995) (citing *Tunstall v. Office of Judicial Support*, 820 F.2d 631, 633 (3d Cir. 1987)). Thus, Plaintiff's right to recover counsel fees under §1988 depends on whether he has stated a claim under §1983, §1985, or §1986. *See id; see also Gelpi v. City of Phila.*, 183 F. Supp. 3d 684, 691 (E.D. Pa. 2016) ("Because Plaintiff's §§1981, 1983, and 1985 claims have all been dismissed, we similarly grant the City's Motion to Dismiss Count 1 insofar as it asserts a claim to attorney's fees pursuant to §1988.")

As discussed above, Plaintiff has pled a §1983 due process claim that is sufficient to overcome a Rule 12(b)(6) dismissal. Consequently, Plaintiff's claim for attorney's fees presently

survives as well. Defendants' motion to dismiss Count I will be denied insofar as it relates to Plaintiff's claim for counsel fees under 42 U.S.C. § 1988.[8]

### 2.     Plaintiff's State Law Claims

In Counts II through IV of the Complaint, Plaintiff asserts claims under Pennsylvania law for alleged malicious prosecution, abuse of process, and intentional infliction of emotional distress, respectively. Defendants raise a number of challenges to these claims, each of which will be addressed *seriatim*.

### a.     Judicial Witness Immunity

Rodgers contends that the state law claims should be dismissed to the extent they are based on his act of testifying at Plaintiff's preliminary hearing. Rodgers' argument is well-taken. Pennsylvania affords witnesses absolutely immune from liability for their testimony given or used in connection with judicial proceedings, even when the testimony is alleged to be false. *See LLMD of Michigan, Inc. v. Jackson–Cross Co.*, 740 A.2d 186, 188–89 (Pa. 1999) (discussing the privilege and quoting *Briscoe v. LaHue*, 460 U.S. 325, 103 S. Ct. 1108, 1112–1114, 75 L.Ed.2d 96 (1983)). "[The] judicial privilege applies to communications issued in the regular course of judicial proceedings, which 'include all proceedings in which an officer or tribunal exercises official functions.'" *Greenberg v. McGraw*, 2017 PA Super 136, --- A.3d ---, 2017 WL 1788356, at *5 (Pa. Super. Ct. May 5, 2017) (quoting *Doe v. Wyoming Valley Health Care Sys., Inc.*, 987 A.2d 758, 766 (Pa. Super. Ct. 2009)). Counts II through IV will be dismissed with prejudice to the extent they are predicated upon testimony given by Rodgers in connection with Plaintiff's criminal proceedings.

---

[8] Of course, Plaintiff cannot assert a stand-alone cause of action pursuant to § 1988, and he concedes as much. (*See* Pl. Br. Opp. Mot. Dismiss at 9, ECF No. 16.) Accordingly, to the extent Plaintiff is attempting to assert a substantive cause of action under § 1988, such claim is dismissed with prejudice.

### b.    The Borough's Liability for Intentional Torts

Worthington Borough argues that it is exempt from liability to the extent that liability is grounded upon the intentional torts of its employees.    This argument, too, is well-taken. Pursuant to Pennsylvania's Political Subdivision Tort Claims Act, 42 Pa. Const. Stat. Ann. §8541 et seq., a municipality is immune from any liability arising from the intentional torts of its agents or employees. *See id.* § 8542(a)(2); *see also Williams v. Borough of Olyphant*, No. 3:13-CV-02945, 2016 WL 595394, at *3 (M.D. Pa. Feb. 12, 2016); *Mon Rail Terminal, Inc. v. Borough of Dunlevy*, No. CIV.A. 12-159, 2012 WL 6591769, at *6 (W.D. Pa. Dec. 18, 2012); *Zernhelt v. Lehigh Cty. Office of Children and Youth Servs.*, 659 A.2d 89, 90 (Pa.Commw.Ct.1995).    Therefore, the claims against the Borough in Counts II through IV will be dismissed with prejudice.

### c.    Plaintiff's Abuse of Process Claim

Feeney argues that Plaintiff has failed to state a plausible claim for abuse of process.    To demonstrate abuse of process, the plaintiff must prove that "the defendant (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to the plaintiff." *Rosen v. Am. Bank of Rolla*, 627 A.2d 190, 192 (Pa. Super. Ct. 1993); *see also Price v. City of Phila.*, No. CV 15-1909, 2017 WL 895586, at *19 (E.D. Pa. Mar. 7, 2017).    "'[T]he gist of an action for abuse of process is the improper use of process after it has been issued, that is, a perversion of it.'" *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 304 (3d Cir. 2003) (alteration in original) (quoting *McGee v. Feege*, 535 A.2d 1020, 1023 (Pa. 1987)).    "A 'perversion' of legal process occurs when a party uses the process 'primarily to accomplish a purpose for which the process was not designed.'" *Id.* (quoting *Dumont Television & Radio Corp. v. Franklin Elec. Co. of Phila.*, 154

A.2d 585, 587 (Pa. 1959)). Consequently, "'there is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an incidental motive or spite or ulterior purpose of benefit to the defendant.'" *Id.* at 305 n.2 (quoting *Rosen*, 627 A.2d at 192). Illegitimate purposes include, for example, "extortion, forcing a defendant to surrender a legal right, or blackmail." *Mawson v. Pittson Police Dep't*, No. 13-1714, 2014 WL 3735133, at *10 (M.D. Pa. July 28, 2014). Notably, "'[a]buse of process differs from malicious prosecution in that the gist of the tort is not commencing an action or causing process to issue without justification, but misusing, or misapplying process justified in itself for an end other than that which it was designed to accomplish.'" *Gen Refractories Co.*, 337 F.3d at 305 (quoting *In re Larsen*, 616 A.2d 529, 592-93 (Pa. 1992)).

In this case, the Defendants are accused of using legal process to achieve its intended purpose (namely, to subject Plaintiff to criminal charges) for reasons motivated by an improper ulterior motive (*i.e.*, to ruin Plaintiff's policing career and cover up their own wrongdoing). (*See* Compl. ¶197.) Plaintiff does not allege an after-the-fact, improper perversion of process that was properly initiated; rather, he alleges the wrongful initiation of process in the first instance. The essence of these allegations is malicious prosecution, not abuse of legal process. Because Plaintiff's averments do not amount to an abuse of process, Count III of the Complaint will be dismissed with prejudice.

### d. High Public Official Immunity

Feeney next argues that he is immune from liability as a "high public official." Pennsylvania courts have long held that high public officials are immune from suits seeking damages for actions taken or statements made in the course of their official duties. *See Durham v. McElynn,* 772 A.2d 68, 69 (Pa. 2001). "This common law doctrine of tort immunity existed

36

before enactment of the Political Subdivision Tort Claims Act, 42 P.S. §8541 et seq., and was not abrogated by it." *Id.* (citation omitted). "Although the doctrine of high public immunity originated in defamation suits, . . . , the Supreme Court of Pennsylvania has stated it may be extended beyond the defamation context so long as the officials' actions were undertaken within the scope of their authority." *Feistl v. Luzerne Intermediate Unit*, No. CV 3:14-0491, 2016 WL 1162325, at *6 (M.D. Pa. Mar. 24, 2016) (citing *Jonnet v. Bodick*, 244 A.2d 751, 753 (Pa.1968)) (internal citation omitted).

Several courts in Pennsylvania have determined that an individual's status as mayor of a municipality is sufficient to confer "high public official" status. *See, e.g., Gaston v. Caugherty*, No. CV 14-1436, 2015 WL 8601232, at *13 (W.D. Pa. Dec. 14, 2015) ("As Mayor of the Borough of Blairsville, Caugherty was a "high public official" for the purposes of the doctrine [of high public official immunity].") (citing cases); *Ballas v. City of Reading*, 2001 WL 73737, at *11 (E.D. Pa. Jan. 25, 2001) (holding that city mayor had an absolute privilege against liability for state law claims of wrongful termination and loss of consortium); *Suppan v. Kraitzer,* 660 A.2d 226 (Pa. Commw. Ct. 1995) (finding that mayor and borough council president were high public officials); *see also Ostrowski v. D'Andrea*, No. CV 3:14-CV-00429, 2015 WL 10434888, at *8 (M.D. Pa. Aug. 11, 2015)(court noting in dicta that "it is clear that certain public officials, such as borough mayors and borough council members, are 'high public officials' as a matter of law"), *report and recommendation adopted sub nom. Ostrowski v. Doe*, No. 3:14-CV-429, 2016 WL 862477 (M.D. Pa. Mar. 7, 2016), *appeal dismissed sub nom. Ostrowski v. Officer John Doe,* No. 16-1842 (3d Cir. Apr. 11, 2016). Thus, Feeney is properly considered a "high public official" for purposes of immunity protection, and Plaintiff does not contend otherwise.

37

The question thus becomes whether Feeney's alleged conduct was undertaken in the course of his official duties and within the scope of his authority. Here again, Plaintiff does not even address, much less dispute, this aspect of Feeney's immunity defense. Furthermore, Plaintiff repeatedly alleges in the Complaint that Feeney acted in his "official capacity" as Mayor of Worthington Borough. (*See* Compl. ¶ 166 ("Defendants Mayor Feeney and Officer Rodgers, both acting in their official capacities, did alter evidence, steal money, plant evidence, and give false testimony about firearms transfers so that Chief DeForte would be charged criminally."); *id.* ¶177 (alleging that, while testifying at Plaintiff's Omnibus Motion Hearing, Feeney admitted that he had broken into Plaintiff's locker at the Pine Township Police Department with the help of a Pine Township Supervisor and "had acted in his official capacity as the Mayor of Worthington Borough"); *id.* ¶187 ("Both Mayor Feeney and Officer Rodgers while acting in their official capacities as Worthington Borough Mayor and Worthington Borough Police Officer . . . maliciously directly influenced the Pennsylvania State Police and Armstrong County District Attorney's Office into initiating criminal proceedings."); *id.* ¶¶194 and 200 (incorporating prior averments into Counts III and IV). Accordingly, based on Plaintiff's own averments and his implicit concession that Feeney is immune from liability as a "high public official," the claims against Feeney in Counts II through IV of the Complaint will be dismissed with prejudice.

### e. Supplemental Jurisdiction

The Borough and Feeney argue that this Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims. Pursuant to 28 U.S.C. §1367(c)(3), district courts have the discretion to decline to exercise supplemental jurisdiction when, among other things, the court has dismissed all claims over which it had original jurisdiction. Because the Court has

not dismissed all aspects of Plaintiff's §1983 claims, §1367(c)(3) has no applicability. Accordingly, this aspect of the Defendants' motion will be denied.

## III.    PLAINTIFF'S MOTION TO AMEND

The Court next considers Plaintiff's motion to amend the Complaint. The proposed amendments do not substantively change the original Complaint's allegations, nor do they effectuate any changes to Counts I through IV. Instead, they would simply add two additional counts to the pleading – namely, a procedural due process claim against Feeney at Count V and a conversion claim against Feeney at Count VI. Both causes of action are predicated on Feeney's involvement in taking Plaintiff's personal property from his secured locker at the Pine Township Police Department. The proposed claims are asserted against Feeney in both his official and individual capacities.

### A.    Standard of Review

Federal Rule of Civil Procedure 15 governs the amendment of pleadings. Subsection (a)(1) permits an amendment once as a matter of course under certain circumstances not present here.[9] "In all other cases, a party may amend its pleading [before trial] only with the opposing party's written consent or with leave of court." Fed. R. Civ. P. 15(a)(2). The rule directs that leave to amend pleadings shall be freely given "when justice so requires." Thus, a court should generally allow a party to amend its pleading where the circumstances do not involve undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies, undue prejudice to the nonmovant, or an amendment that would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir.

---

[9] Amendment as a matter of course is permitted within: (A) 21 days after service of the pleading, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier. Fed. R. Civ. P. 15(a)(1). Because Plaintiff sought leave to amend the complaint more than 21 days after service of the pending motions to dismiss, subsection (a)(1) is inapplicable.

2000); *Long v. Wilson*, 393 F.3d 390, 400 (3d Cir. 2004) ("'[A]bsent undue or substantial prejudice ... denial [can] be grounded in bad faith or dilatory motive, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed or futility of amendment.'") (quoting *Lundy v. Adamar of N.J., Inc.*, 34 F.3d 1173, 1196 (3d Cir. 1994) (internal quotation marks omitted)).

## B. Analysis of Proposed Counts V and VI

Feeney argues that the amendments set forth at proposed Counts V and VI should not be allowed because, among other things, the claims are time-barred. "Technically, the Federal Rules of Civil Procedure require a defendant to plead an affirmative defense, like a statute of limitations defense, in the answer, not in a motion to dismiss." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citation omitted). However, "[t]he law of this Circuit (the so-called 'Third Circuit Rule') permits a limitations defense to be raised by a motion under Rule 12(b)(6), . . . if the time alleged in the statement of the claim shows that the cause of action has not been brought within the statute of limitations." *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) (internal quotation omitted). If the pleading does not indicate, on its face, when the statute of limitations began to run, it may not provide a basis for dismissal under Rule 12. *Stephens v. Clash*, 796 F.3d 281, 288 (3d Cir. 2015) (quoting *Schmidt*, 770 F.3d at 251–52). On the other hand, a plaintiff may plead himself out of court by alleging facts that are sufficient to establish the limitations defense on the face of the complaint. *Schmidt*, 770 F.3d at 252 (quoting *Hollander v. Brown*, 457 F.3d 688, 691, n.1 (7th Cir. 2006)).

### 1. Proposed Count V

Section 1983 claims are governed by the statute of limitations for personal injury torts in the state where the claim arose. *Wallace v. Kato*, 549 U.S. 384, 387 (2007). In Pennsylvania,

the limitations period is two years. *See Warner v. B. Pietrini & Sons Const.*, 588 F. App'x 106, 107 (3d Cir. 2015) (citing 42 Pa. Cons. Stat. § 5524). A Section 1983 cause of action accrues when the plaintiff knows or has reason to know of the injury that constitutes the basis of his claim. *Id.* (citing *Sameric Corp. of Del., Inc. v. City of Phila.*, 142 F.3d 582, 599 (3d Cir.1998)). Stated differently, accrual occurs when the tort is complete and an actionable claim exists. *See Koehnke v. City of McKeesport*, 350 F. App'x 720, 723 (3d Cir. 2009) ("[A] Section 1983 claim accrues at the time when the injury is sustained" or "when the plaintiff has a complete and present cause of action*."); Leonard v. City of Pittsburgh*, No. 2:13-CV-455, 2013 WL 4541727, at *4 (W.D. Pa. Aug. 27, 2013), *aff'd*, 570 F. App'x 241 (3d Cir. 2014) (noting that "'accrual' of a cause of action occurs at the moment at which each of its component elements has come into being as a matter of objective reality, . . .") (quoting *William A. Graham Co. v. Haughey*, 646 F.3d 138, 150 (3d Cir.2011), *aff'd*, 570 F. App'x 241 (3d Cir. 2014).

In this case, the alleged constitutional injury – *to wit,* an unlawful search of Plaintiff's locker and the unlawful seizure therefrom of his personal property – occurred on October 30, 2012. (*See* Amended Compl. ¶¶123-125.) Plaintiff's §1983 claim therefore accrued on that date, and the two year limitations period ostensibly expired on or around October 30, 2014. Plaintiff did not assert his §1983 claim until May 25, 2016, when he sought leave to amend the Complaint in order to add proposed Count V. Consequently, an ordinary application of the accrual rule would mean that Plaintiff's claim is time-barred. This would remain true even if we assume for the sake of argument that Count V relates back to the filing date of the original complaint – *i.e.*, January 14, 2016 --, since the two-year limitations period seemingly expired well before January of 2016.

41

Notwithstanding this, Plaintiff contends that the statute of limitations period was tolled pursuant to the "discovery rule," making his cause of action timely. While the accrual of a §1983 claim is a matter of federal law, tolling is generally determined under state law. *See Kach v. Hose*, 589 F.3d 626, 639 (3d Cir.2009) (citing *Hardlin v. Straub*, 490 U.S. 536, 539 (1989)).[10] Pursuant to Pennsylvania's "discovery rule," the statute of limitations is tolled "until the injured party discovers or reasonably should discover that he has been injured and that his injury has been caused by another party's conduct." *Fine v. Checcio*, 870 A.2d 850, 859 (Pa. 2005). The Pennsylvania Supreme Court has interpreted this rule narrowly, stating that its application depends not on the plaintiff's knowledge of a legal injury *per se,* but rather, on his "actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct." *Wilson v. El-Daief,* 964 A.2d 354, 364 (Pa. 2009). In order to invoke the discovery rule, a plaintiff must be able to demonstrate that he exercised reasonable diligence in discovering his injury. *Id.* at 362-63. The burden is on the plaintiff to show reasonable diligence. *Id.* at 362.

In this case, it is clear from the face of the proposed Amended Complaint that the discovery rule cannot save Plaintiff's otherwise untimely §1983 claim. As noted, the unlawful search of the lockers and seizures of personal property allegedly occurred on October 30, 2012. Plaintiff claims that, "[o]n or about a day later," Airgood recovered what he could of Plaintiff's

---

[10] "Where state tolling principles contradict federal law or policy, federal tolling principles may apply in certain limited circumstances." *Kach v. Hose*, 589 F.3d 626, 639 (3d Cir.2009). Such circumstances do not appear to exist here, so the Court will apply Pennsylvania tolling principles.

In any event, however, this Court has previously suggested that there is no meaningful distinction between the federal "discovery rule" and Pennsylvania's "discovery rule." *See Leonard v. City of Pittsburgh,* Civil Action No. 2:13-cv-455, 2013 WL 4541727, at *5 n. 8 (W.D. Pa. Aug. 27, 2013), *aff'd*, 570 F. App'x 241 (3d Cir. 2014) (comparing *Fine v. Checcio*, 582 Pa. 253, 870 A.2d 850, 859 (Pa.2005) (statute of limitations should be tolled "until the injured party discovers or reasonably should discover that he has been injured and that his injury has been caused by another party's conduct") with *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1386 (3d Cir. 1994) (limitations period tolled until plaintiff "should have discovered (1) that he or she has been injured, and (2) that this injury has been caused by another party's conduct.")).

remaining personal belongings, as well as his own. (Amended Compl. ¶127.)[11] In the process of doing so, Airgood discovered that the locks on his locker and Plaintiff's had been broken off and certain items were missing, including the firearm transfer documents that Plaintiff had entrusted to him. (*Id.* ¶¶127-128, 215-217.) When Airgood attempted to recover the remaining personal items, he was informed by "Pine Township Supervisors" that some of Plaintiff's personal property – namely, a mountain bike, a mini fridge, a personal firearm and ammunition locker, a small filing cabinet, and a Colt bayonet -- had been forfeited and were "now the property of Pine Township." (*Id.* ¶218-219.) Numerous other items of Plaintiff's personal property were withheld from him following the October 30 incident, including "15 [to] 20 AR 15 magazines, an Aim Point Red-Dot Scope, approximately 400 rounds of reloaded 45 ACP ammunition, two rifle cases, [and] a Bench-Made Knife," among others. (*Id.* ¶262.) Within days of the October 30, 2012 search and seizure, the Pine Township police department was summarily disbanded by the Township's supervisors, and Plaintiff and Airgood lost their jobs. (*Id.* ¶126.)

Based on these averments, Plaintiff plainly knew, or had reason to know, of the break-in of his locker and the seizure of his personal property shortly after it occurred on October 30, 2012. In fact, Plaintiff does not contend otherwise; instead, he acknowledges in the proposed Amended Complaint that he was aware of the possible violation of his Fourth Amendment rights but he "believed that Pine Township and Moore [were] directly responsible" for it. (Amended Compl. ¶222.) Plaintiff further alleges that he assumed the Pine Township and Supervisor Moore had sole possession of the rest of his missing property. (*Id.* ¶¶220-221.) Although Plaintiff believed it was "plausible that Feeney had participated in a 4th Amendment violation," (*id.* ¶222), he asserts that this was only a "hunch," (*id.*), and he "had no probable knowledge" of

---

[11] Elsewhere in the proposed Amended Complaint, Plaintiff alleges that "[o]n or about October 30, 2012 Christopher Airgood ("Airgood") recovered a portion [of] both Plaintiff's and Airgood's property. (Amended Compl. ¶215.)

Feeney's involvement in the break-in of his locker or the seizing of his property until the summer of 2014, when he received the Commonwealth's discovery packet in connection with his criminal proceedings. (*Id.* ¶¶212-214, 231.) At that point, Plaintiff obtained police reports which provided "evidence implicating Feeney in the illegal search and seizure of [his] property." (*Id.* ¶231.) Thus, Plaintiff claims, the statute of limitations did not start running until "the moment of discovery in the summer of 2014." (*Id.* ¶232.)

Plaintiff's theory is misguided. In order to establish the applicability of Pennsylvania's discovery rule, a party must establish that he acted with reasonable diligence in determining the fact of injury but was unable to ascertain it. *Weik v. Estate of Brown*, 794 A.2d 907, 909 (Pa. Super. Ct. 2002) (citation omitted). Based on the averments in the proposed Amended Complaint, Plaintiff plainly was aware of his injury (and Feeney's possible complicity in it) shortly after its occurrence. Plaintiff admittedly knew that Feeney had "visited Pine Township" on the day in question. (Amended Compl. ¶212.) He also knew that it was Feeney's practice to "routinely go through the private lockers and desk drawers of the Worthington Borough Police Department." (*Id.* ¶211.) He admittedly "clashed with Feeney (*id.* ¶16) and believed it was "plausible" that Feeney had participated in the October 30 search of his locker and seizure of his property. (*Id.* ¶222.) In fact, Plaintiff admits that his concerns about Feeney were serious enough that he discussed them with the Pennsylvania State Police in the hopes that the state police would investigate the situation. (*Id.* ¶223.) In light of these averments, it is of no legal moment that Plaintiff did not possess actual evidence of Feeney's involvement at the time. *See New Castle Cnty. v. Halliburton NUS Corp.*, 111 F.3d 1116, 1125 (3d Cir.1997) (noting that "the discovery rule does not delay the accrual of a cause of action until the plaintiff has identified every party who may be liable on its claim," and it was "sufficient that [the plaintiff] was aware that its

44

injury was caused in part by another person's conduct");[12] *Glass v. Rozum,* No. 3:14-cv-61-KRG-KAP, 2014 WL 7011917, at \*2 (W.D. Pa. Dec. 10, 2014) (Report and Recommendation adopted) ("It is not necessary that plaintiff knows precisely who caused the injury or precisely how a defendant caused the injury: upon discovering an injury a plaintiff has a duty to investigate the injury and its cause within the limitations period or forego a remedy.") (citing *Vitalo v. Cabot Corp.,* 399 F.3d 536 (3d Cir. 2005)).

Plaintiff nevertheless insists that he could not have pursued his claim prior to the summer of 2014 because he lacked access to his locker, did not know that Feeney had personally seized any items or breached his personal locker, and was not permitted to attend a private meeting where Feeney allegedly displayed many of Plaintiff's personal items to other Borough officials. Again, the argument is unpersuasive. None of these facts, even if true, precluded Plaintiff from making basic inquiries as to the whereabouts of his personal belongings or the circumstances under which they had been seized. *See Mariner Chestnut Partners, L.P. v. Lenfest,* 152 A.3d 265, 279 (Pa. Super. Ct. 2016) ("A party fails to exercise reasonable diligence, [for purposes of invoking the discovery rule,] when it fails to make an inquiry when the information regarding the injury becomes available".) (citing *Fine v. Checcio,* 870 A.2d 850, 858 (Pa. 2005)). Plaintiff's mere lack of awareness about Feeney's involvement is not enough to justify application of the rule. *See id.* ("Mistake, misunderstanding, or lack of knowledge in themselves do not toll the running of the statute.") (quoting *Fine,* 870 A.2d at 857).

In sum, it is plain from the face of the proposed Amended Complaint that Plaintiff's §1983 claim based on the alleged violation of his Fourth Amendment rights is time-barred.

---

[12] Although *New Castle County,* as a federal law case applying the federal discovery rule, does not control the Pennsylvania discovery rule inquiry, the Court finds it persuasive and applicable here, especially because there is substantial congruency between the Pennsylvania and federal "injury caused by another" component to the discovery rule.

Accordingly, Plaintiff's motion to amend the complaint will be denied on grounds of futility with respect to Count V.

## 2. Proposed Count VI

Plaintiff's proposed Count VI would add a claim under Pennsylvania law for conversion of the property that Feeney allegedly took from Plaintiff's private locker at the Pine Township Police Department. Like his §1983 claim at Count V, Plaintiff's conversion claim is subject to a two-year statute of limitations period. *See* 42 Pa. Cons. Stat. Ann. §5524(3); *Douglas v. Joseph*, 656 F. App'x 602, 605 (3d Cir. 2016).

The rules of accrual are also essentially the same for Counts V and VI. "In Pennsylvania, the statute of limitations begins to run when the cause of action accrues." *Douglas,* 656 F. App'x at 605 (citing *Fine v. Checcio*, 870 A.2d 850, 857 (Pa. 2005)). Accrual generally occurs when the plaintiff can maintain an action to a successful conclusion. *Id.* (quoting Kapil *v. Ass'n of Pa. State Coll. & Univ. Faculties*, 470 A.2d 482, 485 (Pa. 1983)). Under Pennsylvania law, "'[c]onversion is a tort by which the defendant deprives the plaintiff of his right to a chattel or interferes with the plaintiff's use or possession of a chattel without the plaintiff's consent and without lawful justification.'" *Conquest v. WMC Mortg. Corp.*, No. CV 16-03604, 2017 WL 1177106, at *19 (E.D. Pa. Mar. 30, 2017) (quoting *Pittsburgh Const. Co. v. Griffith*, 834 A.2d 572, 581 (Pa. Super. Ct. 2003)). To establish a valid claim, the plaintiff must establish that the defendant wrongfully took property from the plaintiff. *Id.* (citing *Pittsburgh Const. Co.,* 834 A.2d at 581).

For the reasons discussed, the averments in the proposed Amended Complaint establish, on their face, that Plaintiff's claim against Feeney for conversion of his personal property accrued on October 30, 2012. In addition, the discovery rule does not make Count VI timely

because Plaintiff clearly knew of his injury shortly after it occurred, and he failed to exercise reasonable diligence in confirming Feeney's involvement in the alleged wrongdoing. Plaintiff's motion to amend will therefore be denied with respect to Count VI.

### C.    Amendment of Counts I through IV

Although Plaintiff did not seek leave to further amend Counts I through IV, it is appropriate for this Court to consider whether further amendment could potentially cure any of the deficiencies discussed herein. *See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007)(recognizing that district courts, before dismissing a case for failure to state a claim, must give the plaintiff an opportunity to amend the complaint, whether or not the plaintiff has asked to do so, unless further amendment would be inequitable or futile) (citing *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004)). Based on the analysis set forth above, it does not appear that further amendment would cure the defects in Plaintiff's official capacity claims at Complaint Count I, his individual capacity claims under 42 U.S.C. §§ 1985 and 1986 at Count I, his § 1983 claim for malicious prosecution at Count I, or his state law abuse-of-process claim at Count III. Accordingly, those claims will be dismissed with prejudice.

## IV.    CONCLUSION

For the reasons set forth above, the motion to dismiss filed by Rodgers (ECF No. 11) and the motion to dismiss filed by Worthington Borough and Feeney (ECF No. 12) will be denied relative to: (i) Plaintiff's §1983 claims against Rodgers and Feeney in their personal capacities, to the extent those claims are predicated on an alleged Fourteenth Amendment violation stemming from the Defendants' alleged fabrication of evidence, as set forth in Count I of the Complaint, (ii) Plaintiff's §1988 claim for attorneys' fees relative to the aforementioned Fourteenth Amendment "fabrication of evidence" claim, (iii) and Plaintiff's state law claims

against Rodgers for alleged malicious prosecution and intentional infliction of emotional distress, as set forth in Counts II and IV of the Complaint. In all other respects, the Defendants' motions will be granted, and the remaining claims will be dismissed with prejudice.

Further, for the reasons set forth above, Plaintiff's motion to amend the Complaint (ECF No. 21) will be denied. An appropriate Order will issue.

Mark R. Hornak
United States District Judge

Dated: June 6, 2017

cc: All counsel of record